FILED

02/28/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0592

DA 14-0592

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 40

STATE OF MONTANA,

   Plaintiff and Appellee,

 v.

MELVIN LEE MADPLUME, JR.,

   Defendant and Appellant.

APPEAL FROM: District Court of the Twentieth Judicial District,
      In and For the County of Lake, Cause No. DC 13-143
      Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Chad Wright, Chief Appellate Defender, Helena, Montana

   For Appellee:

     Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
     Attorney General, Helena, Montana

     Steven N. Eschenbacher, Lake County Attorney, Polson, Montana

           Submitted on Briefs: January 25, 2017

              Decided: February 28, 2017

Filed:

          _____
                Clerk

Justice Dirk M. Sandefur delivered the Opinion of the Court.

¶1 Following a jury trial in the Twentieth Judicial District Court, Lake County, Melvin Lee Madplume Jr. was convicted of deliberate homicide under the felony murder rule, § 45-5-102(1)(b), MCA, and sentenced to life without parole. Madplume timely appealed, arguing the District Court erred in admitting evidence of prior acts barred by M. R. Evid. 404(b). Madplume also claims the District Court sentenced him to pay costs of defense, prosecution, and jury selection without sufficient findings regarding his ability to pay. We affirm the District Court's evidentiary ruling, reverse the sentence to pay costs, and remand for an inquiry into Madplume's ability to pay.

## ISSUES

¶2 Madplume raises two issues on direct appeal:

*1. Did the District Court abuse its discretion in admitting evidence of Madplume's prior acts under M. R. Evid. 404(b) and 403?*

*2. Did the District Court err in sentencing Madplume to pay costs of assigned defense, prosecution, and jury selection without a sufficient inquiry into his ability to pay?*

## BACKGROUND

¶3 Madplume's conviction stems from the May 25, 2013 death of his 28-year-old cousin, Laurence Kenmille, at Wild Horse Hot Springs in Hot Springs, Montana. In its initial charging documents, the State recited the details of a prior, uncharged incident involving Madplume and another male cousin at Wild Horse. Madplume filed a motion in limine to exclude from trial all evidence of the prior event. The District Court denied Madplume's motion and admitted the evidence as proof of motive, opportunity, intent,

2

preparation, and plan. Because the District Court based its decision on a comparison of the circumstances of Kenmille's death and the prior incident, a brief explanation of each event is required.

**A. Prior Incident**

¶4 A week before Kenmille's death, Madplume and Bassu Eneas (Bassu) went to J.B.'s house to ask if he would drive them to Wild Horse. Like Kenmille, J.B. and Bassu were both cousins of Madplume. At the time, Madplume and J.B. were 29 and 40 years old, respectively, but Bassu was still a teenager. Madplume explained that he and Bassu had been drinking and needed a sober driver to take them to the hot springs. J.B. agreed to go with them in Madplume's car, but Madplume ended up driving. At Madplume's insistence, J.B. consumed two shots of whisky and began drinking a beer on the way to Wild Horse. When they arrived at Wild Horse, J.B. noticed that no one was working at the front desk, which made him uncomfortable about going inside. Madplume insisted he had reserved a room and led J.B. and Bassu to Room Four.

¶5 Room Four featured a private "plunge room" and sauna. The plunge room housed a sunken, cement hot tub filled with water piped in from the hot springs. The tub was situated against two walls in a corner of the room. A high metal railing wrapped around the tub's two open sides and down seven concrete steps into the tub. Because of the railing, the steps were the only way in and out of the tub. A short ledge along one wall provided the only seating available in the tub. In the corner of the plunge room opposite the tub, a metal door with a glass window led to a small sauna.

3

¶6    At first, J.B. was reluctant to get into the tub with Madplume and Bassu. A recent surgery on his foot left him self-conscious and leery of getting an infection from the water. Madplume, however, claimed to have a background in healthcare from working as a CNA, and assured J.B. that the hot water would be good for his foot. When J.B. finally joined Madplume and Bassu in the tub, Madplume began pestering J.B., asking to see his foot up close. When J.B. relented, Madplume touched J.B.'s inner thigh, which J.B. interpreted as a sexual advance and resisted, pushing Madplume away. Madplume then told Bassu to leave the room. Once Bassu was gone, Madplume accused J.B. of leading him on. J.B. got angry and tried to leave, but the combination of heat, alcohol, and the foot surgery made him unsteady. Madplume blocked the steps out of the hot tub and pushed J.B. back into the water multiple times. Eventually, J.B. pushed past Madplume, put on his shoes, and left the room.

¶7    J.B. found Bassu outside and told him what had happened, warning him against being alone with Madplume. Without cell service or other options to leave Wild Horse, J.B. and Bassu had to rely on Madplume to get home. When Madplume offered to drive them home, they accepted. The ride home began with Madplume speeding toward the highway, drifting from side to side across the dirt road leading away from Wild Horse. Upon reaching the highway, instead of turning left toward J.B.'s home, Madplume turned right toward Hot Springs. After Madplume sped past a cutoff road to Ronan, J.B. started getting mad again and demanded that Madplume pull over. When Madplume stopped, J.B. got out and began walking toward a local convenience store. About 20 minutes later,

4

Madplume returned and encouraged J.B. to get back in the car. J.B. climbed in, and after more erratic driving, Madplume eventually took J.B. back to his home.

## B. Kenmille's Death

¶8 Madplume had purchased two bottles of rum before heading to Kenmille's mother's house for a late breakfast on May 25, 2013. At the time, Kenmille was staying at his mother's house. After visiting with friends and family in the neighborhood, Madplume, Kenmille and Youstah Eneas, Bassu's 16-year-old brother, went to Wild Horse. According to Wild Horse employees, the three men arrived around 3 p.m. and had already begun partying and drinking the rum Madplume had brought. The employees noted that Kenmille was particularly boisterous at first, but as the day went on he became more inebriated and subdued. Later in the afternoon, a Wild Horse employee noticed that Kenmille's speech was slurred and he was leaning on walls for support. Madplume, on the other hand, seemed normal.

¶9 At about 5 p.m., Madplume and company made their way to Room Four, the same room where Madplume and J.B. had their altercation less than a week earlier. Madplume and Kenmille put on swim trunks and got into the hot tub, but Youstah was feeling sick and decided to wait in the lobby. Over the course of the evening, Youstah made several trips back to Room Four to ask Madplume and Kenmille if they were ready to leave. The second time Youstah checked in, Kenmille seemed barely awake; his eyes were closed and his head was down, but above the water. Madplume assured Youstah that Kenmille was all right and said they would be done soon.

5

¶10     Back in the lobby, Youstah told one of the Wild Horse employees about Kenmille's state, and the employee said he would check on Kenmille and Madplume. Youstah then went looking for something to eat and passed Room Four along the way. He glanced through the window and saw Madplume hunched over, as if he was carrying something. Youstah did not enter the room to see what Madplume was doing, but continued his search for food until he had circled the building and arrived back in the lobby.

¶11     The final time Youstah went back to the room, he saw Kenmille sitting naked next to Madplume in the hot tub. Madplume volunteered that they were all right and everything was still fine, but Youstah started to worry when he noticed the water was tinted red around Kenmille. He also saw the glass in the door to the sauna was broken and shards of glass on the floor appeared to be speckled with blood. Madplume explained that Kenmille had slipped and fallen earlier, but assured Youstah that Kenmille was fine—he was just faking being asleep. Youstah went back to the lobby and told one of the employees to check on Kenmille.

¶12     Derek Smith was working at Wild Horse with his father, Dave Smith, on the day Kenmille died. Derek responded to Youstah's first request for someone to check on Kenmille. On that visit, Derek entered the plunge room and asked if Madplume and Kenmille needed anything. Derek noticed that Kenmille was in the corner of the hot tub, leaning forward with his face in the water while Madplume sat next to him, patting his back. Madplume said they did not need anything, and Derek left. At some point in the afternoon, Dave reported hearing glass breaking in the direction of Room Four, as well as

6

noise that he described as the sounds of men rough-housing and laughing. One of the owners of Wild Horse walked by the room to see if the front window was broken, but did not go inside the room to see if glass had broken elsewhere.

¶13 Derek also checked on Madplume and Kenmille after Youstah noticed blood on the broken glass of the sauna door and what appeared to be blood in the tub around Kenmille. During that check-in, Madplume asked if Derek would help pull Kenmille out of the tub. At trial, Derek recalled that the tub's water was murky, as if someone had vomited in it. Madplume pushed Kenmille to a spot where Derek and Youstah could reach over the tub's railing and help pull Kenmille out. As they were moving Kenmille, Madplume's grip slipped and Kenmille's face sank under the water, but Kenmille did not appear to react. After they removed Kenmille from the tub, Derek noticed bruises on Kenmille's shins. Derek went back to the lobby to get his father's help.

¶14 As Kenmille lay unresponsive on the floor next to the hot tub, blood began to pool under the back of his head. Confusion and panic set in. After some discussion, Madplume, Youstah, Derek and Dave decided to try to put Kenmille in Madplume's car to drive him to the hospital. That plan failed because Kenmille was taller than the car was wide and his knees had become too stiff to bend. Someone then called 911 and Youstah started CPR.

¶15 After the ambulance arrived and took Kenmille to the hospital in nearby Plains, Madplume drove away with Youstah, ostensibly to follow the ambulance to the hospital. When they arrived in Plains, however, Madplume drove past the hospital and into a wooded area, speeding up along the way. Madplume was driving 90 miles per hour when

7

they passed a police officer who had stopped another car on the side of the road. As they approached Thompson Falls, Youstah threatened to grab the steering wheel and crash the car if Madplume would not turn back toward Plains. Madplume finally turned the car around, but on the way back to Plains, the officer they passed earlier caught up to them, pulled them over, and arrested Madplume.

¶16 Kenmille's body was sent to the state crime lab for a postmortem examination. In addition to multiple blunt force injuries to the head, abdomen, and extremities, the autopsy revealed hyperinflated lungs, fluid in the sphenoid sinus, and froth in Kenmille's airways. Based on these findings, the medical examiner concluded Kenmille was probably drowned violently. The medical examiner's report also noted rectal bruises and lacerations consistent with anal penetration.

¶17 The State initially charged Madplume with deliberate homicide and sexual intercourse without consent, but later amended the charges to a single count of deliberate homicide under the felony murder rule with sexual intercourse without consent as the predicate offense. Before trial, Madplume moved to exclude evidence of his altercation with J.B. pursuant to Rule 404(b), which generally bars evidence of prior bad acts. The State responded that it intended to use the evidence to show Madplume's motive, opportunity, intent, preparation, and plan—all of which are uses specifically allowed by Rule 404(b). After evaluating the similarities between the prior incident and the alleged crime, the District Court determined that the evidence was admissible under Rule 404(b) as proof of a modus operandi and denied Madplume's motion.

8

¶18 A jury convicted Madplume after a seven-day trial. The District Court sentenced Madplume to life without possibility of parole and ordered Madplume to pay $33,634.29 in costs for assigned defense counsel, prosecution, and jury selection. Madplume objected to the sentence based on his inability to pay the costs. According to its written judgment, the District Court "determined the ability to pay based on [Madplume's] prior work history earnings in prison and eligibility for tribal benefits." Madplume timely appealed both the imposition of costs and the admission of evidence of the prior incident with J.B.

**STANDARDS OF REVIEW**

¶19 District courts have broad discretion to determine the admissibility of evidence. *State v. Spottedbear*, 2016 MT 243, ¶ 9, 385 Mont. 68, 380 P.3d 810. We review evidentiary rulings for an abuse of discretion, which occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Spottedbear*, ¶ 9. To the extent an evidentiary ruling is based on a district court's interpretation of the Montana Rules of Evidence, our review is de novo. *Spottedbear*, ¶ 9.

¶20 We review criminal sentences of more than one year of incarceration for legality, considering whether the sentence adheres to the relevant sentencing statutes. *State v. Gable*, 2015 MT 200, ¶ 6, 380 Mont. 101, 354 P.3d 566. In this context, our review is de novo. *Gable*, ¶ 6.

**DISCUSSION**

¶21    *1.    Did the District Court abuse its discretion in admitting evidence of Madplume's prior acts under M. R. Evid. 404(b) and 403?*

**A. Rule 404(b)**

¶22    "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  M. R. Evid. 404(b).  The aim of Rule 404(b) is to ensure jurors do not impermissibly infer that a defendant's prior bad acts make that person a bad person, and therefore, a guilty person.  *State v. Dist. Court of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 (hereinafter "*Salvagni*"); *see also State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 64 (purpose of Rule 404 is "to prevent convictions that are merely based on a jury finding that someone has a propensity to do certain things").

¶23    Although not admissible to show bad character or propensity to commit the charged offense, evidence of prior bad acts is admissible for other purposes such "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  M. R. Evid. 404(b).  The distinction between admissible and inadmissible Rule 404(b) evidence turns on the intended purpose of the evidence, not its substance.  *Salvagni*, ¶¶ 47, 62–63. To prevent the permissible uses from swallowing the general rule barring propensity evidence, the trial court must ensure that the use of Rule 404(b) evidence is "clearly justified and carefully limited." *Aakre*, ¶ 12.  Mere reference to a permissible purpose is insufficient for admission of other acts evidence under Rule 404(b).  Other acts evidence is admissible for a permissible Rule 404(b) purpose only if

"the proponent [can] clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *State v. Clifford*, 2005 MT 219, ¶ 48, 328 Mont. 300, 121 P.3d 489 (internal quotation omitted).

¶24 Madplume asserts the State merely raised the "magic pass words" motive, opportunity, intent, preparation, and plan to provide cover for its true purpose of unfairly painting him as a "homosexual predator." Madplume further asserts that mere similarity and nearness in time do not establish a permissible Rule 404(b) purpose for introducing other acts evidence. However, while not necessary in every case or necessarily sufficient alone for admissibility of prior bad acts evidence, evidence of the similar circumstances of a charged offense and an uncharged act may be logically relevant to prove a permissible Rule 404(b) purpose which may in turn give rise to the logical non-propensity inference that the defendant committed the charged offense. *Salvagni*, ¶ 56. For example, "the charged and uncharged acts must be uniquely similar when proving identity" if "the prosecutor's theory of logical relevance is modus operandi." *Salvagni*, ¶ 60. The modus operandi theory of logical relevance is often used when the identity of the perpetrator is in doubt and the prior acts are "'so nearly identical in method as to earmark them as the handiwork of the accused.'" *Salvagni*, ¶ 60 (quoting *State v. Kordonowy*, 251 Mont. 44, 49, 823 P.2d 854, 857 (1991)).

¶25 The facts of the present case raise no question about the *identity* of Kenmille's assailant—Madplume was the only other person in the room when Kenmille drowned. Nevertheless, the District Court characterized the State's purpose as follows:

11

The State intends to introduce the testimony of [J.B.] and [Bassu] to show Defendant's motive, opportunity, intent, preparation, and plan in the sexual assault and death of Mr. Kenmille based on the similarity between the two alleged assaults, amounting to a *modus operandi*.

Although the District Court conflated the distinct concepts of motive, opportunity, intent, preparation, and plan by merging them together under a broad interpretation of modus operandi, we conclude the evidence of the J.B. incident was properly admitted for purposes originally cited by the State.

¶26   The District Court noted several key similarities between the two events: on both occasions Madplume directed the parties to the same private plunge room at Wild Horse; on both occasions Madplume provided the alcohol and encouraged the alcohol use by both victims; in both cases Madplume brought along a younger cousin to make the victim feel more comfortable; in both cases Madplume maneuvered himself into intimate proximity with an isolated victim; and on both occasions the alleged sexual contact and altercations between Madplume and the victims took place while the younger cousin was out of the room.   The circumstantial similarity and nearness in time of the two events were logically relevant to show Madplume's common plan, motive, and intent.

¶27   In its closing argument, the State asserted that, wanting initially to hide his sexual feelings towards J.B. and Kenmille, Madplume brought Bassu and Youstah along to make J.B. and Kenmille feel comfortable.   Madplume asserts that the State's reasoning was "designed to illicit [sic] fears about homosexual men physically assaulting straight men." Madplume also takes issue with the following remarks made during the State's closing argument:

12

> When you start to listen to [J.B.'s] story and you look at what happened to [Kenmille] in that room, there's a really simple, logical deduction here that helps you conclude beyond a reasonable doubt what happened. [Kenmille] wasn't as lucky as [J.B.].

¶28 Madplume analogizes the State's remarks to *State v. Franks*, 2014 MT 273, 376 Mont. 431, 335 P.3d 725. In *Franks*, the prosecution introduced testimony from an alleged rape victim who said she came forward after reading a newspaper story about the defendant facing unrelated child molestation charges. *Franks*, ¶ 17. The prosecution claimed the purpose of the testimony was to show why the victim came forward. *Franks*, ¶ 18. But when the defendant took the stand to explain that he was acquitted of the other charges, the prosecution asked him a pointed question that implied he was a "child molester who had simply gotten away with it." *Franks*, ¶ 19. During closing argument, the prosecutor also said the alleged victim was "lucky" that the unrelated molestation charges were reported in the newspaper and rhetorically questioned "the odds" of the defendant facing such accusations. *Franks*, ¶ 8. These remarks cast the defendant as a child molester but provided little insight into whether he had committed the charged offense. *Franks*, ¶¶ 18–19. We concluded that the prosecution's use of the other acts evidence exceeded the permissible, non-character purpose for which it was admitted and instead created "the impression that [the defendant] was a habitual abuser of children." *Franks*, ¶ 22.

¶29 Rule 404(b) expressly authorizes the use of uncharged similar acts evidence to prove that the accused committed the charged offense in accordance with a common plan. Here, the State used the similar circumstances of the uncharged J.B. incident to show

13

Madplume's plan. Just as he had done with J.B., Madplume invited Kenmille to accompany him and a younger cousin to Wild Horse under the guise of drinking and partying together. Just as he tried to do with J.B., Madplume carried out the same plan of getting Kenmille intoxicated and isolating him in Room Four's private hot tub so Madplume could have sex with him. The State's argument about Madplume's purpose for bringing a younger cousin along in each incident did not imply that all homosexual men prey on straight men. Nor did the argument insinuate that homosexual men are predisposed to sexually assaulting straight men. Rather, the State permissibly used the similar uncharged act to show the steps in Madplume's plan to have sex with Kenmille at Wild Horse. Unlike *Franks*, where the prosecution used the other acts evidence to imply the defendant had a propensity for child molestation, the logical chain connecting the J.B. incident to Kenmille's death did not involve an impermissible character or propensity inference.

¶30 Rule 404(b) likewise permits other acts evidence to prove the defendant committed both acts with a common motive or intent. *Salvagni*, ¶ 59. Under this theory,

> the uncharged act *evidences the existence* of a motive but does not *supply* the motive. . . . [T]he motive is cause, and the charged and uncharged acts are effects; that is, both acts are explainable as a result of the same motive. The prosecutor uses the uncharged act to show the existence of the motive, and the motive in turn strengthens the inference of the defendant's identity as the perpetrator of the charged act.

*Salvagni*, ¶ 59 (emphasis in original). Here, the circumstances of both events were sufficiently similar and near in time to logically show a common motive and intent to provide and encourage the victim's use of alcohol in a private, scantily-clad, and intimate

14

setting for the purpose of facilitating sex with an otherwise reluctant victim. This evidence was logically probative of Madplume's motive or intent to commit the predicate sex offense which was an essential element of the charged offense. The evidence of the J.B. incident was thus permissible under Rule 404(b) to identify Madplume as the perpetrator of the charged offense. We therefore conclude that the District Court did not abuse its discretion in admitting evidence of the uncharged J.B. incident to prove Madplume's plan, motive and intent to commit the sex offense predicate of the charged offense of felony-murder deliberate homicide.

¶31     As an alternative to its Rule 404(b) analysis, the District Court determined the J.B. incident was also admissible as habit evidence pursuant to Rule 406. Because the other acts evidence was properly admitted under Rule 404(b), we decline to reach the District Court's alternate grounds for admission under Rule 406.

### B. Rule 403

¶32     "All relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state." M. R. Evid. 402. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." District courts have broad discretion to weigh the relative probative value of evidence against the risk of unfair prejudice. *State v. Stewart*, 2012 MT 317, ¶ 68, 367 Mont. 503, 291 P.3d 1187.

15

¶33 Probative evidence is generally prejudicial to one side or the other. *State v. Lamarr*, 2014 MT 222, ¶ 19, 376 Mont. 232, 332 P.3d 258 (citing *Stewart*, ¶ 68). Evidence rises to the level of being unfairly prejudicial only "if it arouses the jury's hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues." *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149 (citing *State v. Huether*, 284 Mont. 259, 265, 943 P.2d 1291, 1295 (1997)). Even if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must substantially outweigh the evidence's probative value. M. R. Evid. 403.

¶34 Twenty years ago, we acknowledged that there may be individuals on any given jury who find the sexual preferences of a homosexual or bisexual person offensive. *State v. Ford*, 278 Mont. 353, 362–63, 926 P.2d 245, 250 (1996). While perhaps less likely today, the fact remains that some jurors may be so agitated by a person's sexual orientation that it distracts from the pertinent facts of the case. We have therefore cautioned trial courts to safeguard against the potential prejudice a juror may feel toward homosexual and bisexual individuals. *City of Kalispell v. Miller*, 2010 MT 62, ¶ 14, 355 Mont. 379, 230 P.3d 792.

¶35 Madplume asserts that J.B.'s testimony about the prior uncharged incident was unfairly prejudicial because of the inherent societal prejudice against homosexuality. The record indicates the District Court instructed the jury on three separate occasions that the prior incident with J.B. was admissible only to prove Madplume's motive, opportunity, plan, or intent to commit the charged offense. The District Court thrice reminded the jury

16

that Madplume was "not being tried for any other bad act" and could not "be convicted for any other offense than that charged in this case." We also note that Madplume's sexual orientation was highly probative of the underlying felony of non-consensual sexual intercourse with another man. To the extent the admission of the prior incident with J.B. implicated Madplume's sexual preferences, the District Court had a reasonable basis to conclude the evidence's probative value outweighed the risk of unfair prejudice, particularly as mitigated by the Court's repeated limiting instructions to the jury. The District Court therefore did not abuse its discretion in admitting the prior incident under Rule 403.

¶36 *2. Did the District Court err in sentencing Madplume to pay costs of assigned defense, prosecution, and jury selection without a sufficient inquiry into his ability to pay?*

¶37 A district court may sentence a defendant to pay the costs of assigned counsel only if the defendant can pay or will be able to pay those costs. Section 46-8-113(4), MCA. A similar rule controls sentences to pay prosecution costs. Section 46-18-232(2), MCA. These statutes require the court to "'demonstrate a serious inquiry or separate determination' into the defendant's ability to pay the fine." *State v. Moore*, 2012 MT 95, ¶ 14, 365 Mont. 13, 277 P.3d 1212 (quoting *State v. McLeod*, 2002 MT 348, ¶ 34, 313 Mont. 358, 61 P.3d 126). This type of inquiry is particularly important before sentencing a defendant to pay the costs of jury service pursuant to § 46-18-232(1), MCA. *Moore*, ¶ 18. Due to the potential chilling effect a sentence to pay jury costs could have on a defendant's constitutional right to request a jury trial, trial courts must "scrupulously and meticulously" determine the defendant's ability to pay those costs. *Moore*, ¶ 18.

17

¶38 Over Madplume's objection, the District Court imposed costs associated with assigned defense counsel, prosecution, and jury selection. During the sentencing hearing, the District Court reasoned that Madplume could pay the costs with "earnings in the Montana State Prison that can be allocated for restitution and perhaps, as indicated by the State, any payments from the Tribe to which he's entitled." The District Court's written judgment explained that its determination of Madplume's ability to pay was "based on [his] prior work history earnings in prison and eligibility for tribal benefits."

¶39 On appeal, the State explains that the District Court's references to Tribal payments and benefits were based on statements Madplume made in his first interview with an investigator on May 26, 2013. During that interview, Madplume said he and Kenmille had talked about taking a trip after they each received a $10,000 payment from the Confederated Salish and Kootenai Tribes. At the time, Madplume said the Tribes would make the payments "pretty soon." Madplume's pre-sentence investigation report, dated April 2, 2014, indicates he had some outstanding student loan debt, but no income or assets.

¶40 The record before us does not reflect an adequate inquiry into Madplume's ability to pay. Before it imposed defense, prosecution, and jury costs, the District Court was required to consider whether the record contained particularized, non-speculative facts that indicated Madplume had a reasonable ability to pay the assessed costs. If the record lacked those facts, the District Court should have asked Madplume directly and made a record of Madplume's ability to pay. *See* § 46-8-113(3), MCA ("In any proceeding for the determination of whether a defendant is or will be able to pay the costs of counsel, the

court shall question the defendant as to the defendant's ability to pay those costs . . . ."). The pre-sentence investigation report gives no indication that Madplume could pay the levied costs. Nor does the record indicate the District Court asked Madplume directly about his ability to pay. Moreover, the Tribal payments cited by the State and the District Court seem to be supported by nothing more than speculative small talk between Madplume and Kenmille.

¶41 The State encourages us to apply the doctrine of implied findings to fill the holes in the District Court's broad findings. Under that doctrine, we may logically imply findings necessary to the determination if they are supported by facts in the record and consistent with more generally articulated findings of the district court. *Gable*, ¶ 18 (affirming general finding of ability to pay based on general reference to sufficient assets without reference to specific assets). The record before us does not contain sufficient, non-speculative information about Madplume's assets or income to apply the doctrine of implied findings. We therefore conclude that the District Court erred in imposing costs based on purely speculative information about Madplume's ability to pay.

## CONCLUSION

¶42 We affirm the District Court's ruling on the admission of evidence related to Madplume's prior altercation with J.B. Madplume's conviction stands. Because the record provides no basis for determining Madplume's ability to pay costs of assigned defense counsel, prosecution, and jury selection, we reverse only that portion of his sentence and remand for the District Court to conduct the appropriate inquiry.

19

/S/ DIRK M. SANDEFUR

We concur:


/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JIM RICE