FILED

07/05/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0807

DA 14-0807

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2017 MT 164

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

MATTHEW JOHN BLAZ,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DC 13-119
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Chief Appellate Defender, Kristen L. Peterson, Assistant
Appellate Defender (argued), Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Micheal S. Wellenstein,
Assistant Attorney General (argued), Helena, Montana

          Eileen Joyce, Silver Bow County Attorney, Samm Cox, Michael Clague,
Deputy County Attorneys, Butte, Montana

Argued: May 1, 2017
Submitted: May 2, 2017
Decided: July 5, 2017

Filed:

                       _____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Matthew John Blaz (Blaz) appeals the judgment entered by the Second Judicial District Court, Silver Bow County, convicting him of Deliberate Homicide. We address the following issues:

*1. Did the District Court abuse its discretion by admitting evidence about the prior PFMA conviction under M. R. Evid 404(b)?*

*2. Did the District Court err by issuing a nonconforming written judgment that omitted credit for 318 days of time served?*

¶2    We affirm in part, reverse in part, and remand for entry of an amended judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On August 16, 2013, Blaz's infant daughter, Matti, died after being in Blaz's care for the day. Matti was born in June 2013, via cesarean section, and was approximately 53 days old at the time of her death. Dr. Walter Kemp, Deputy State Medical Examiner, determined Matti's cause of death to be craniocerebral and cervical trauma. Matti's autopsy revealed: (1) blunt force trauma to her head and neck, primarily on the left side;[1] (2) abrasions on the left side of her chin and on the right side of the base of her neck near her chest; and (3) evidence of an older injury on one of her ribs. At trial, Dr. Kemp testified

---

[1] Matti's autopsy report stated:
> The significant autopsy findings in this death are the subgaleal hemorrhage and underlying left parietal skull fracture (indicating an impact site), the bilateral thin subdural hemorrhage and bilateral subarachnoid hemorrhage, the left frontal lobe laceration (underlying the skull fracture . . .), the bilateral diffuse and extensive retinal hemorrhages, involving multiple layers and with apparent retinoschisis, and the hemorrhages within the cervical dorsal root ganglia and adjacent nerves.

Matti likely died as the result of "a very strong, forceful slam against some broad object."

Under questioning of the prosecutor, Kemp testified as follows:

> Q.   And how about as to the manner of [Matti's] death?  Do you have an opinion?
> A.   Yes.
> Q.   And what is the manner of the death?
> A.   Homicide.
> Q.   And what do you base that on?
> A.   I believe that the cause of [Matti's] death was an intentional and harmful act caused by another person that resulted in her death.

Continuing, Kemp opined that a fall or a drop could not have caused the injuries he found at autopsy.  He stated:

> Q.   So just so we're clear, based upon the fracture to her skull, the tear to her brain, extensive damage to her eyes, and the tears in her neck, you believe the manner of death in this case is homicide[?]
> A.   Yes.
> Q.   And there's no way that this could have come from a simple fall[?]
> A.   I do not believe this came from a simple fall, no.

¶4   On July 10, 2013, Blaz, Matti, and Jennifer, Matti's mother, were involved in an altercation in their home.  At the time, Matti was about 16 days old, and Jennifer was recovering from her cesarean section and a subsequent infection of the surgical site.  Having returned home from playing softball, Blaz was intoxicated and, while holding Matti, began "dozing off."  Jennifer took Matti from him, stating she was going to change and feed Matti.  While Jennifer was in the kitchen preparing Matti's bottle and holding her, Blaz came up behind them, grabbed Jennifer by the hair, and threw her, while she was still holding Matti, to the floor.  He then started banging Jennifer's head against the floor.  By the time Jennifer was able to regain her feet, Blaz had taken Matti.  During the assault,

3

Matti's older sister, K.Y.,[2] and K.Y.'s friend retreated to the basement of the house. When K.Y. heard a slam to the floor, she and her friend started yelling, "stop it," to which Blaz retorted, "tell them to shut up or I'm coming down there." K.Y. and her friend hid under a bed. Out of this incident, Blaz was charged with and pled guilty to Partner or Family Member Assault (PFMA). He received a six month suspended sentence and was ordered to have no contact with Jennifer.

¶5 Blaz returned to live in the home despite the No Contact Order. On the morning of August 16, 2013, Blaz stayed home from work with Matti and K.Y. Accompanied by Matti and K.Y., Blaz took Jennifer to work between 8:00 and 8:30 a.m. At that point, Matti appeared to be fine and was acting normally. After returning home, Blaz watched television with Matti, while K.Y. played in the basement with a neighbor girl. At approximately 10:00 a.m., Blaz stepped out of the residence to quiet the dog and talk to the mailman. Matti was lying on a blanket on the floor in front of the television, and Blaz indicated that he could see her from his vantage point outside the house. While Blaz and the mailman were talking, a neighbor boy, brother of the girl playing inside with K.Y., entered the house to see what the girls were doing. Testimony about what occurred after this point diverged.

¶6 According to Blaz, he looked in the house and saw the neighbor boy holding Matti. He then heard a loud scream, entered the house, and saw Matti screaming on the blanket,

---

[2] K.Y. is Jennifer's biological daughter and Blaz's stepdaughter.

4

while the neighbor boy hovered over her. Blaz asked what happened and the boy ran downstairs. Blaz picked up Matti and tried to calm her. He yelled downstairs and asked the kids what happened, to which the girls replied that they had not done anything. The boy was in the house for a short time, then he left.

¶7 According to the neighbor boy, he heard Matti crying inside when he arrived at the house. He testified that he had tickled Matti, but did not pick her up. He confirmed that, when he was downstairs, Blaz had asked the children if any of them had touched or picked up Matti. The neighbor boy testified that he went downstairs to see what the girls were doing, got bored, and left shortly thereafter.

¶8 At approximately 11:00 a.m., Blaz called Jennifer at work to discuss lunch plans. During the conversation, Blaz did not mention that anything had happened to Matti during the morning or any concerns about Matti's wellbeing. Around noon, Blaz took a lunch to Jennifer, leaving Matti with K.Y. and the neighbor girl. When Blaz left, Matti was sleeping, and she slept for most of the afternoon. At approximately 4:00 p.m., Blaz took Matti and K.Y. to pick Jennifer up from work, after which the group drove to Walmart. On the way, Blaz mentioned to Jennifer that the neighbor boy might have dropped Matti. Jennifer said she would check Matti when they arrived at Walmart and, at that time, she observed Matti's skin was ashen, her breathing was unusual, and she had bulging eyes. Acting urgently, Jennifer directed they take Matti to the hospital, where she died.

¶9 At trial, Blaz asserted Matti's death was the result of being dropped by the neighbor boy. The State sought admission of evidence related to the July PFMA charge against Blaz

5

pursuant to M. R. Evid. 404(b). The State argued the PFMA was relevant and rebutted Blaz's defense because it demonstrated motive, opportunity, and the absence of accident or mistake. The District Court admitted the PFMA over Blaz's objection. Blaz appeals.

## STANDARD OF REVIEW

¶10 District courts have broad discretion to determine the admissibility of evidence. *State v. Daffin*, 2017 MT 76, ¶ 12, 387 Mont. 154, 392 P.3d 150 (citing *State v. Madplume*, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142). We review evidentiary rulings for an abuse of discretion, which occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Daffin*, ¶ 12 (citing *Madplume*, ¶ 19). To the extent an evidentiary ruling is based on a district court's interpretation of the Montana Rules of Evidence, our review is de novo. *Daffin*, ¶ 12 (citing *Madplume*, ¶ 19).

## DISCUSSION

¶11 *1. Did the District Court abuse its discretion by admitting evidence about the prior PFMA conviction under M. R. Evid. 404(b)?*

¶12 M. R. Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The Rule does not bar evidence, but rather prohibits a "theory of admissibility"—using evidence of other crimes or wrongs to prove the defendant's subjective character "in order to show conduct in conformity with that character on a particular occasion." *State v. Dist. Court of the Eighteen Judicial Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 [hereinafter *Salvagni*]. Rule 404(b) prohibits admission

6

of evidence to prove how a person *is*—fundamental character—for the purpose of implying conduct in accordance therewith, but does not necessarily prohibit admission of evidence to prove how a person *acts*—patterns of behavior—in circumstances related to the charged conduct. Rule 404(b) permits admission of prior "bad acts" evidence for "other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This is a non-exclusive list[3] of permissible purposes that are not precise; rather, the categories are amorphous, overlapping, and dependent upon the underlying facts. As we have stated, "'[t]he distinction between admissible and inadmissible Rule 404(b) evidence turns on the intended purpose of the evidence, not its substance.'" *Daffin*, ¶ 15 (quoting *Madplume*, ¶ 23). Rule 404(b) evidence "must be clearly justified and carefully limited." *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648. We turn to the application of the Rule in this case, and the purposes offered by the State for introduction of Blaz's prior PFMA conviction.

**M. R. Evid. 404(b)**

**A. Motive**

¶13 Motive was extensively argued, both to the District Court and to this Court, as a basis for admitting the PFMA under Rule 404(b). The District Court stated that the "prior act [was] probative of Blaz's feelings toward Jennifer and toward Jennifer's family and children living in the household," and reasoned the PFMA was "reflective and probative

---

[3] "Other-acts evidence 'may be admissible for *many other purposes*, including those specifically listed in Rule 404(b).'" *State v. Stout*, 2010 MT 137, ¶ 97, 356 Mont. 468, 237 P.3d 37 (Nelson, J., dissenting) (citation omitted; emphasis added).

7

of the alleged homicide" of Matti, and was therefore admissible. Blaz argues that the PFMA evidence "was not probative of a common motive [resulting] from Blaz's common feelings," nor was it admissible "to show a motive to hide evidence." The State urges that the motive for both crimes was a "complete disregard" for Matti's safety and wellbeing. Further, the State argues that

> the evidence of Blaz's prior PFMA provided the motive or explanation for why Blaz did not immediately bring Matti to the hospital for treatment of her injuries. As part of his PFMA suspended sentence, the city court ordered Blaz to have no contact with Jennifer. Blaz knew that taking Matti to the hospital would have revealed that he had been having contact with Jen[nifer] [] . . . and it would have provided grounds to revoke his suspended sentence.

¶14 Motive can be a broad, nebulous concept. According to *Black's Law Dictionary*, motive is "[s]omething . . . that leads one to act." *Black's Law Dictionary* 1172 (Bryan A. Garner ed., 10 ed. 2014). But *Black's* further notes that "'[t]he term "motive" is unfortunately ambiguous. That feeling which internally urges or pushes a person to do or refrain from doing an act is an emotion, and is of course evidential toward his doing or not doing the act.'" *Black's Law Dictionary, supra*, at 1172 (quoting John H. Wigmore, *A Students' Textbook of the Law of Evidence* 76 (1935)). We have stated that "[e]vidence is admissible to show motive when separate acts can be explained by the same motive," *Daffin*, ¶ 19 (citing *State v. Crider*, 2014 MT 139, ¶ 25, 375 Mont. 187, 328 P.3d 612), and further explained that,

> the motive is *cause, and the charged and uncharged acts are effects*; that is, both acts are explainable as a result of the same motive. The prosecutor uses the uncharged act to show the existence of the motive, and *the motive in turn strengthens the inference of the defendant's identity* as the perpetrator of the charged act.

*Salvagni*, ¶ 59 (footnote omitted; emphasis added).

¶15 During oral argument, the State explained its motive theory was based upon Blaz's "general hostility," and that the PFMA tended to show Blaz's generally hostile feelings toward Jennifer and Matti. However, to conclude that the acts at issue here "can be explained by the same motive," *Daffin*, ¶ 19, or that both acts "are effects," *Salvagni*, ¶ 59, of the "causes" of general hostility or complete disregard for others, without more, would define motive very broadly and cast a wide net indeed for use of motive under Rule 404(b), potentially encroaching upon the impermissible use of motive as propensity evidence. We conclude that something further is necessary to demonstrate a cause and effect relationship. Such additional evidence was presented here.

**B. Identity and Pattern**

¶16 Under Rule 404(b), identity and pattern often overlap because unique behavior patterns can be used to establish identity. As we noted in *Daffin*, evidence of "distinctive or idiosyncratic methods" can illustrate "criminal signatures" and demonstrate a pattern, which can be used to identify a specific individual. *Daffin*, ¶¶ 17-18. In some instances, the evidence may be "offered to identify the defendant by showing that she committed the uncharged act with a modus operandi strikingly similar to that of the charged act." *Salvagni*, ¶ 56. In this case, linking motive evidence with pattern and identity evidence creates a clear picture of Blaz's "criminal signature."

¶17 Facets of Blaz's PFMA were similar to facets of the crime alleged here. First, Matti was a victim of the earlier domestic violence just as she was of the intentional acts that

9

caused her death. Blaz's earlier action illustrates a pattern of resolving family issues with violence and demonstrates his careless disregard for Matti's safety and wellbeing. Second, and most importantly, is the similarity between the method of Blaz's assault upon Jennifer during the PFMA, and the mechanics of the injuries sustained by Matti. Jennifer testified that, during the PFMA, Blaz grabbed her by her hair, threw her to the floor, and started banging her head against the floor. Dr. Kemp testified that Matti suffered craniocerebral and cervical trauma caused by "a very strong, forceful slam against some broad object." These two injuries have similar mechanics, both involve a cranial assault inflicted by impact against a broad surface: Jennifer was grabbed by the head and slammed into the floor, while Matti sustained severe head trauma, including a skull fracture, and bruising on her neck. These were violent acts directed to the head and, in Matti's case, caused death. Further, both the PFMA and the violence causing Matti's death occurred in the privacy of the Blaz home, out of the sight and presence of others who could intervene. Jennifer and Matti were assaulted when the family returned home after a softball game. Additionally, Matti sustained injuries in the same home, while under Blaz's care. Both victims were female family members. Taken as a whole, these facts suggested a pattern of Blaz (1) reacting to family problems, specifically with female family members, with violence; (2) attacking the heads of his victims; (3) striking his victims' heads against a broad or flat surface; and (4) attacking while in the privacy of the family home. These facts were evidence of a pattern of behavior, which is a permissible purpose and admissible under Rule 404(b).

## C. Absence of Mistake or Accident

¶18 Blaz argues the PFMA was inadmissible to show an absence of mistake or accident because Blaz never said he had any part—accidental or otherwise—in causing Matti's death. He argues, "[f]undamental to the premise that other acts be admitted to show '*absence* of mistake or accident,' is that the defendant claims *he* made a mistake." (Emphasis in original.) The State argues evidence of the PFMA "strengthens the inference that [Blaz] killed Matti and rebuts his theory that [the neighbor boy] killed Matti by accidently dropping her on the living room floor." As noted above, Blaz's defense theory was that the neighbor boy dropped Matti, causing her death. The State sought to introduce evidence of the PFMA to rebut this defense theory.

¶19 In this case, much like in *Salvagni*, the purposes of pattern and identity are closely related to the absence of mistake or accident. As we have here explained, the PFMA and the violence toward Matti have similar elements which form a relevant pattern and serve to rebut Blaz's defense that Matti was killed by the neighbor boy. The State's case was largely circumstantial and relied heavily on the testimony of Dr. Kemp. However, the PFMA permissibly illustrated a pattern of conduct by Blaz linking his documented actions and the manner of Matti's death. The District Court did not abuse its discretion in admitting the evidence.

## M. R. Evid. 403

¶20 "All relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state." M. R. Evid. 402.

11

M. R. Evid. 403 allows relevant evidence to be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Probative evidence is usually prejudicial, but rises to the level of being unfairly prejudicial only "if it arouses the jury's hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues." *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149. "Even if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must substantially outweigh the evidence's probative value." *Madplume*, ¶ 33. "A district court may minimize unfair prejudice by admitting evidence for a particular purpose and limiting the uses to which the jury may put the evidence." *State v. Pulst*, 2015 MT 184, ¶ 19, 379 Mont. 494, 351 P.3d 687 (citations omitted). Finally, "[a] limiting instruction generally cures any unfair prejudice." *State v. Hantz*, 2013 MT 311, ¶ 44, 372 Mont. 281, 311 P.3d 800 (citing *Salvagni*, ¶ 49).

¶21 Before the District Court, Blaz's Rule 403 argument was focused on the autopsy photographs. The District Court applied the Rule 403 balancing test and admitted the autopsy photographs. On appeal, Blaz focuses his current Rule 403 argument on the PFMA evidence, and asks that we conduct the Rule 403 balancing test de novo. However, the District Court implicitly completed Rule 403 balancing when it examined the PFMA evidence and issued a limiting instruction. As noted above, the Rule 403 balancing test

12

favors admission and a limiting instruction to cure any unfair prejudice. Here, the District Court issued jury instruction number 11, which stated:

> The State has offered evidence that the Defendant at another time engaged in other crimes, wrongs[,] or acts. That evidence was not admitted to prove the character of the Defendant or to show he acted in conformity therewith. The only purpose of admitting that evidence was to show proof of motive, opportunity, absence of mistake or accident. You may not use that evidence for any other purpose.
>
> The Defendant is not being tried for that other crime, wrong[,] or act. He may not be convicted for any other offense than that charged in this case. For the jury to convict the Defendant of any other offense than that charged in this case may result in unjust double punishment of the defendant.

This instruction successfully cured any unfair prejudice that might have occurred when evidence of the PFMA was admitted, and the District Court did not abuse its discretion.

¶22    *2. Did the District Court err by issuing a nonconforming written judgment that omitted credit for 318 days of time served?*

¶23    The State concedes that Blaz is entitled to credit for 318 days, which he served pending trial. The credit was granted during the oral pronouncement of his sentence, but was not credited in the written judgment. We remand this matter to the District Court for entry of an amended judgment granting Blaz credit for 318 days of time served.

¶24    Affirmed in part, reversed in part, and remanded for entry of an amended judgment.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA

13

Justice Laurie McKinnon, dissenting.

¶25 In my view, the Court's decision does great injustice to the purposes of M. R. Evid. 404(b) and opens the door to impermissible propensity evidence that previously had been closed. Because there is a substantial risk that Blaz was convicted not for what he did, but for having committed a PFMA in the past, I respectfully dissent.

¶26 Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible. M. R. Evid. 402. Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. Even relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." M. R. Evid. 403. A further limitation on the rule of admissibility is found in M. R. Evid. 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶27 Rule 404(b) does not forbid the admission of propensity evidence or constitute a bar to propensity evidence; instead, Rule 404(b) prohibits a *theory* of admissibility which allows an ultimate inference to be made when it is premised upon an intermediate inference of the defendant's personal, subjective character. If the prosecutor "can arrive at an ultimate inference of conduct through a different intermediate inference, the prohibition is inapplicable." 1 Edward J. Imwinkelreid, *Uncharged Misconduct* Evidence § 4:1, 5-6

14

(Rev. ed. 2009). ("When the prosecutor develops a theory of logical relevance without an intermediate inference as to the defendant's character, the theory moots one of the dangers. If the prosecutor can develop an alternative intermediate reference, Rule 404(b) will not bar the admission of uncharged misconduct."). When the theory of admissibility depends on an intermediate inference of a defendant's personal, subjective character traits, there is a high risk of misdecision and that the jury will convict because they find the defendant repulsive, immoral, or repugnant. Read together, these rules require the following analysis: first, is the evidence materially relevant; second, is the logical relevance independent of the intermediate inference, prohibited by Rule 404(b), that the defendant acted in conformity with bad character; and, third, does the probative value of the evidence substantially outweigh the danger of unfair prejudice.[1]

¶28    We have stated that "[t]he typical prosecution case is reducible to three elements: (1) a person committed the *actus reus* (i.e. forbidden act) alleged in the indictment or information; (2) that person possessed the requisite *mens rea* (i.e., criminal intent or state of mind), and; (3) that person was the defendant). *Stewart*, ¶ 64 (citations omitted). Here, there was no question that Matti was killed by nonaccidental trauma. The prosecution demonstrated through its forensic evidence and Dr. Kemp's testimony that Matti's death occurred through human agency, which was intentional. I agree with the Court's

---

[1] In a criminal prosecution, most of the evidence will be prejudicial to the defendant. *State v. Stewart*, 2012 MT 317, ¶ 68, 367 Mont. 503, 291 P.3d 1187 (citing *State v. Belanus*, 2010 MT 204, ¶ 14, 357 Mont. 463, 240 P.3d 1021). Thus, "unfair" prejudice refers to the degree the jury might impermissibly rely on the intermediate inference of propensity.

assessment that this "case was largely circumstantial and relied heavily on the testimony of Dr. Kemp." Opinion, ¶ 19. The only element that therefore remained for the State to prove concerned whether Blaz was the person who committed the crime: that is, the element of identity remained disputed. The State sought admission of the PFMA evidence based on motive, opportunity, and absence of accident or mistake. The District Court denied Blaz's motion in limine on the basis that evidence of the prior PFMA was "reflective" and "probative of Blaz' feeling toward [Mom] and toward [Mom's] children living in the household." This Court concludes, through still another theory, the PFMA was admissible as evidence of "distinctive or idiosyncratic methods" and illustrates a "criminal signature" which can be used to specifically identify Blaz. Opinion ¶ 16. However, regardless of which theory of admissibility relied upon—that offered by the State, the District Court, or this Court—none are premised upon relevance that is sufficiently independent of the intermediate inference, prohibited by Rule 404(b), that Blaz committed the crime charged because of the likelihood that he acted in conformity with his conduct underlying his PFMA. In the interest of brevity, I will address only the Court's flawed analysis that the evidence was admissible pursuant to: (1) Blaz's "criminal signature," and (2) absence of mistake or accident.

¶29 *A. The PFMA does not demonstrate a unique and distinctive methodology permitting an inference of Blaz's identity.*

¶30 It is well settled that the State may introduce evidence of prior bad acts to prove the defendant's identity as perpetrator of the charged crime. We have recognized recently in *Daffin* and *Madplume*, both prosecutions for sexual offenses, that evidence of a defendant's

16

commission of an uncharged crime with a *modus operandi* (method of operation) strikingly similar to that of the charged crime is permissible identity evidence pursuant to Rule 404(b). To invoke the *modus operandi* theory, the State must establish that "(1) both crimes were committed with the 'same' or strikingly similar methodology; and (2) the methodology is so unique that both crimes can be attributed to 'one' criminal." Imwinkelreid, *supra* § 3:10, 62. We explained in *State v. Kordonowy*, 251 Mont. 44, 49, 823 P.2d 854, 857 (1991), that "[t]his identity exception is often used to prove other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused." Therefore, when evidence of other crimes or acts are introduced to prove identity, the other crime or act must be "sufficiently distinctive to warrant an inference that the person who committed the crime also committed the offense at issue." *State v. Sweeney*, 2000 MT 74, ¶ 31, 299 Mont. 111, 999 P.2d 296. Significantly, "[a] much greater degree of similarity between the charged crime and the other crime is required when the evidence is introduced to prove identity than when it is introduced to prove a state of mind." *Sweeney*, ¶ 31; *see also* 1 John W. Strong et al., *McCormick on Evidence* § 190, 668 (5th ed. 1999).

¶31    In *Sweeney*, we drew on the Ninth Circuit's reasoning in *United States v. Luna*, 21 F.3d 874, 878-79 (9th Cir. 1994), and stated

> The difference between the proper use of other acts evidence to prove identity and the improper use of such evidence to prove propensity is a subtle matter. It is proper to infer that two distinctive crimes (e.g., two armed bank robberies committed by a person wearing Mickey Mouse ears) were committed by the same person; it is improper to infer that two merely similar crimes (e.g., two armed bank robberies) were, since the latter conclusion

17

depends upon an inference about character. Somewhere along the continuum from merely similar crimes to truly distinctive crimes, an improper inference about propensity (the defendant is guilty because he committed another similar crime, and because people tend to behave consistently) can become a proper inference about identity (these two acts are so distinctive that only one person could have committed them both).

*Luna*, 21 F.3d at 882. Thus, the methodologies for commission of the prior bad act and the crime at issue, must not only be the "same" or "strikingly similar," but the methodology itself must be peculiar and distinct such that "the modus operandi must betray the defendant's personal criminal identity." Imwinkelreid, *supra* § 3:11, 63.

¶32    Here, the Court concludes the PFMA and Matti's death evidenced a "pattern of behavior" sufficient to establish a theory of admissibility based upon modus operandi; that is, the Court concludes that the PFMA and Matti's death are so unique and distinctive, as demonstrated by their methodologies, that an inference arises that only Blaz could have committed them. The Court finds similarity in the "mechanics" of the injury, explaining that both Mom and Matti sustained head injuries resulting from an impact to a "broad" surface. Opinion, ¶ 17. The Court states they were "violent" acts "directed at the head . . . ." Opinion, ¶ 17. The Court finds features of uniqueness in that both victims were "family members" and that the crimes occurred "in the privacy of the family home." Opinion, ¶ 17. This evidence, however, is generic and characteristic of many crimes. Unfortunately, domestic violence and crimes against family members are not unique or distinctive. Indeed, they include a large and diverse class of victims. Furthermore, there is nothing unique or distinctive about committing a crime in private, or doing so in the "privacy of the family home." Crimes against persons normally are "violent" and there is nothing

18

unique about a generalized trauma to the head. Even assuming the appropriateness of the Court designating for the State its theory of admissibility, the Court fails in its attempt to find uniqueness and distinction in what can only be characterized as generic evidence. There is nothing inherently unique and distinctive about the two acts that would point only to Blaz, except that on both occasions Blaz acted in conformity with bad character.

¶33 Conversely, the crimes are distinguishable based upon the following: Mom was injured when Blaz attempted to hold Matti in the first offense, while Matti, who remained asleep during the entire PFMA offense, was not injured; Blaz was intoxicated during the first offense, but not the second; the first offense was directed towards an adult spouse, Mom, and the second offense was directed towards an infant; there was no evidence that Blaz, either intentionally or negligently, was attempting to physically hurt Matti in the first offense, while in the second offense, Matti's death was the result of an intentional act. While many acts of domestic violence will exhibit a pattern or course of conduct establishing a "criminal signature" of the defendant, this is not one of those cases. To be certain, cycles of domestic violence could be relevant in the context of Rule 404(b) evidence. Yet, without evidence of distinctiveness or uniqueness, domestic violence victims are members of a large class, which in and of themselves, do not necessarily establish a "criminal signature" upon the perpetrator. Moreover, while "[a] few states have adopted a specific rule to allow evidence of past acts of domestic violence, by the same defendant against the same victim, to be admitted in prosecutions involving domestic violence without worrying about the purpose for the evidence . . . ," Montana has not. 1

Kenneth S. Broun, *McCormick on Evidence* § 190, 1042 (7th ed. 2013) (footnote omitted).

Today's decision, however, effectively creates a rule through the expedient of relabeling Blaz's propensity for domestic violence as a "criminal signature" and also demonstrating "absence of mistake or accident." *See infra*.

¶34 In *Daffin*, the defendant was charged with 13 sexual offenses, many of them involving children. The Court found the following sufficiently established Daffin's "criminal signature:"

> Here, the testimony of the former victims and other witnesses was used to establish Daffin's methods of victim selection and grooming. Some common elements of Daffin's "criminal signature" included: supplying his victims with alcohol and drugs; driving his victims around in his vehicle; "partying" with his victims; taking them "mudding"; and, eventually, assaulting them. Testimony about Daffin's pattern of sexual abuse detailed a process that started with "flirting"; escalated to sexual conversation and touching that bordered on sexual; proceeded to sexual contact; and concluded by telling the victims they were at fault or complicit in the abuse, and swearing them to silence.

*Daffin*, ¶ 18 (footnotes omitted).

¶35 Similarly in *Madplume*, the defendant was charged with deliberate homicide pursuant to the felony murder rule, with sexual intercourse without consent as the predicate offense. The Court affirmed admission of evidence involving the rape of a different male victim. The Court explained:

> Here, the State used the similar circumstances of the uncharged J.B. incident to show Madplume's plan. Just as he had done with J.B., Madplume invited Kenmille to accompany him and a younger cousin to Wild Horse under the guise of drinking and partying together. Just as he tried to do with J.B., Madplume carried out the same plan of getting Kenmille intoxicated and isolating him in Room Four's private hot tub so Madplume could have sex with him. The State's argument about Madplume's purpose for bringing a

20

younger cousin along in each incident did not imply that all homosexual men prey on straight men. Nor did the argument insinuate that homosexual men are predisposed to sexually assaulting straight men. Rather, the State permissibly used the similar uncharged act to show the steps in Madplume's plan to have sex with Kenmille at Wild Horse. Unlike *Franks*, where the prosecution used the other acts evidence to imply the defendant had a propensity for child molestation, the logical chain connecting the J.B. incident to Kenmille's death did not involve an impermissible character or propensity inference.

*Madplume*, ¶ 29.

¶36 In contrast, we found in *Sweeney* that that the alleged sexual misconduct on both occasions was not "necessarily distinctive in the context of sexual assaults." *Sweeney*, ¶ 34. "Sweeney allegedly performed acts, involving different victims, of a nature that unfortunately give rise to many sexual assault cases." *Sweeney*, ¶ 34. We concluded that "[t]here [was] nothing in Sweeney's alleged conduct that was sufficiently distinctive to warrant an inference that since he committed the prior sexual assault he must have committed the sexual assault [for which he was charged]." *Sweeney*, ¶ 34. While having some similarities, we described the evidence in *Sweeny* as follows:

> In this case, there is some similarity between the age and gender of the victim and the sexual behavior involved in the 1988-89 sexual assault and the 1996 sexual assault,[sic] however, there are also a number of differences. The sexual behavior involved in 1988-89 included Sweeney getting on top of his five-year-old stepdaughter, licking her genitalia, and placing her hands on his penis. With regard to the 1996 assault, Sweeney's nine-year-old niece testified that Sweeney had licked her genitalia and had on another occasion unbuttoned her shirt and pants and touched her chest. In addition, Sweeney's niece testified that on the occasion where he had unbuttoned her clothing, Sweeney had put his hand over her mouth to stop her from screaming and told her to shut up.

*Sweeney*, ¶ 34.

21

¶37 The aforementioned authorities are only a few examples of our prior careful analysis of *modus operandi* evidence to demonstrate identity of the defendant. *See also Salvagni*, ¶ 60; *Kordonowy*, 251 Mont. at 44, 823 P.2d at 854; *Aakre*, ¶¶ 21-29. We have never allowed, as here, the admission of prior acts evidence on the basis of a contrived "linking" together of generic evidence. Opinion, ¶ 16. In doing so, we have distorted our precedent and the purposes underlying Rule 404(b), and opened the door to impermissible propensity evidence. Unfortunately, there is nothing unique or distinctive about crimes against family members committed in the home, and which are both violent and involve injuries to the head. Accordingly, the evidence is not admissible under a theory that it demonstrates a *modus operandi*, a "criminal signature," or a "distinctive or idiosyncratic method[]" of the accused.

¶38 *B. The PFMA is not permissible 404(b) evidence of mistake or absence of accident.*

¶39 The Court also mistakenly finds the PFMA evidence could be admitted to demonstrate the absence of mistake or accident. Here, the Court concludes that the PFMA "illustrated a pattern of behavior" by Blaz that linked Blaz's "documented actions and the manner of Matti's death." Opinion, ¶ 19. Aside from an improper reliance upon the "pattern of behavior" the Court finds to establish identity, the use of evidence to demonstrate absence of mistake or accident relates to the *actus reus* of the crime; that is, whether the crime was accidental or actually a "forbidden act." *Stewart*, ¶ 65. Here, there is no question, based upon Dr. Kemp's testimony and the forensic evidence, that the crime was not an accident. The appropriate use of evidence demonstrating absence of mistake or

accident is premised upon the inference that as the number of incidents increase, the objective probability of accident decreases. That is, it is highly unlikely that the same crime would be committed by so many similar accidental acts. The permissible inference arising from an absence of mistake or accident allowed by Rule 404(b) is that it defies common sense or logic to find coincidence on so many occasions.

¶40 The parties do not dispute that Matti's death was not an accident. Significantly, in *Salvagni*, while the trauma to the victim was "indicative of non-accidental trauma, most likely due to compression of the chest," the cause of death was "undetermined" even though "no definitive natural cause of death was identified." *Salvagni*, ¶ 13. The State intended to prove circumstantially that the defendant purposely and knowingly caused her child's death by suffocating her through a prior incident in which the defendant "placed [the victim's sister] face down in her crib with a blanket rolled up and tied to each side of the crib and the blanket placed on [the child's] neck." *Salvagni*, ¶ 65. The Court held that the prior bad acts evidence was offered to demonstrate "that [the victim] did not die accidentally" and was "relevant to her *intent* and to *rebut* the suggestion that [the victim's] death was accidental." *Salvagni*, ¶ 65 (emphasis added). We did not decide whether, under the particular facts, the State had established a non-propensity inference for admission of the evidence. In fact, we directed that on remand, the State would have to develop a more detailed explanation of the incidents and the District Court would have to conduct an analysis on any objections raised. *Salvagni*, ¶ 65. Accordingly, while perhaps admissible as impeachment or rebuttal evidence, *Salvagni* does not establish that the State may offer

23

prior bad acts evidence under Rule 404(b) when the non-accidental nature of the victim's death is undisputed.

¶41 In these proceedings, there was no dispute that Matti's death was non-accidental and the result of a "forbidden act." *Stewart*, ¶ 65. The *actus reus* was undisputed and established by forensic testimony. Although, as the trial unfolded, the PFMA may have been admissible pursuant to other admissibility theories, the District Court erred in denying Blaz's motion in limine when the stated purpose for admissibility by the State was pursuant to Rule 404(b).

¶42 Finally, assuming arguendo, there was a dispute regarding whether Matti's death was accidental, evidence of the prior PFMA would not have demonstrated a lack of coincidence sufficient to infer that Matti's death was unlikely to have been an accident or mistake. Evidence of this nature, admitted substantively in the State's case-in-chief, would have to provide a sufficient evidentiary correlation to allow an inference that Matti's death could not have been the result of coincidence. Here, the evidence of a single prior PFMA was insufficient to establish such a correlation and inference. Accordingly, any evidence that Neighbor Boy caused Matti's death would have to be supported by an alternative theory of admissibility— impeachment, rebuttal, or some other acceptable premise.

**Conclusion**

¶43 I would conclude that the PFMA evidence was improperly admitted pursuant to Rule 404(b). Further, I would conclude that the prejudicial nature of the evidence of domestic abuse, and the danger the jury would decide the case on this improper basis,

demonstrates that qualitatively there was no reasonable probability the evidence did not contribute to Blaz's conviction.

¶44     I would reverse and remand for a new trial.

/S/ LAURIE McKINNON

Justice Dirk M. Sandefur joins the dissent.

/S/ DIRK M. SANDEFUR