JUSTICE RICE
delivered the Opinion of the Court.
¶1 Matthew John Blaz (Blaz) appeals the judgment entered by the Second Judicial District Court, Silver Bow County, convicting him of Deliberate Homicide. We address the following issues:

*106
1. Did the District Court abuse its discretion by admitting evidence about the prior PFMA conviction under M. R. Evid 404(b)?

2. Did the District Court err by issuing a nonconforming written judgment that omitted credit for 318 days of time served?

¶2 We affirm in part, reverse in part, and remand for entry of an amended judgment.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 On August 16, 2013, Blaz’s infant daughter, Matti, died after being in Blaz’s care for the day. Matti was born in June 2013, via cesarean section, and was approximately 53 days old at the time of her death. Dr. Walter Kemp, Deputy State Medical Examiner, determined Matti’s cause of death to be craniocerebral and cervical trauma. Matti’s autopsy revealed: (1) blunt force trauma to her head and neck, primarily on the left side;[1] (2) abrasions on the left side of her chin and on the right side of the base of her neck near her chest; and (3) evidence of an older injury on one of her ribs. At trial, Dr. Kemp testified Matti likely died as the result of “a very strong, forceful slam against some broad object.” Under questioning of the prosecutor, Kemp testified as follows:
Q. And how about as to the manner of [Matti’s] death? Do you have an opinion?
A. Yes.
Q. And what is the manner of the death?
A. Homicide.
Q. And what do you base that on?
A. I believe that the cause of [Matti’s] death was an intentional and harmful act caused by another person that resulted in her death.
Continuing, Kemp opined that a fall or a drop could not have caused the injuries he found at autopsy. He stated:
Q. So just so we’re clear, based upon the fracture to her skull, the tear to her brain, extensive damage to her eyes, and the tears in *107 her neck, you believe the manner of death in this case is homicide!?]
A. Yes.
Q. And there’s no way that this could have come from a simple fall[?]
A. I do not believe this came from a simple fall, no.
¶4 On July 10, 2013, Blaz, Matti, and Jennifer, Matti’s mother, were involved in an altercation in their home. At the time, Matti was about 16 days old, and Jennifer was recovering from her cesarean section and a subsequent infection of the surgical site. Having returned home from playing softball, Blaz was intoxicated and, while holding Matti, began “dozing off.” Jennifer took Matti from him, stating she was going to change and feed Matti. While Jennifer was in the kitchen preparing Matti’s bottle and holding her, Blaz came up behind them, grabbed Jennifer by the hair, and threw her, while she was still holding Matti, to the floor. He then started banging Jennifer’s head against the floor. By the time Jennifer was able to regain her feet, Blaz had taken Matti. During the assault, Matti’s older sister, K.Y.,[2] and K.Y.’s friend retreated to the basement of the house. When K.Y. heard a slam to the floor, she and her friend started yelling, “stop it,” to which Blaz retorted, “tell them to shut up or I’m coming down there.” K.Y. and her friend hid under a bed. Out of this incident, Blaz was charged with and pled guilty to Partner or Family Member Assault (PFMA). He received a six month suspended sentence and was ordered to have no contact with Jennifer.
¶5 Blaz returned to live in the home despite the No Contact Order. On the morning of August 16, 2013, Blaz stayed home from work with Matti and K.Y. Accompanied by Matti and K.Y., Blaz took Jennifer to work between 8:00 and 8:30 a.m. At that point, Matti appeared to be fine and was acting normally. After returning home, Blaz watched television with Matti, while K.Y. played in the basement with a neighbor girl. At approximately 10:00 a.m., Blaz stepped out of the residence to quiet the dog and talk to the mailman. Matti was lying on a blanket on the floor in front of the television, and Blaz indicated that he could see her from his vantage point outside the house. While Blaz and the mailman were talking, a neighbor boy, brother of the girl playing inside with K.Y., entered the house to see what the girls were doing. Testimony about what occurred after this point diverged.
¶6 According to Blaz, he looked in the house and saw the neighbor *108 boy holding Matti. He then heard a loud scream, entered the house, and saw Matti screaming on the blanket, while the neighbor boy hovered over her. Blaz asked what happened and the boy ran downstairs. Blaz picked up Matti and tried to calm her. He yelled downstairs and asked the kids what happened, to which the girls replied that they had not done anything. The boy was in the house for a short time, then he left.
¶7 According to the neighbor boy, he heard Matti crying inside when he arrived at the house. He testified that he had tickled Matti, but did not pick her up. He confirmed that, when he was downstairs, Blaz had asked the children if any of them had touched or picked up Matti. The neighbor boy testified that he went downstairs to see what the girls were doing, got bored, and left shortly thereafter.
¶8 At approximately 11:00 a.m., Blaz called Jennifer at work to discuss lunch plans. During the conversation, Blaz did not mention that anything had happened to Matti during the morning or any concerns about Matti’s wellbeing. Around noon, Blaz took a lunch to Jennifer, leaving Matti with K. Y. and the neighbor girl. When Blaz left, Matti was sleeping, and she slept for most of the afternoon. At approximately 4:00 p.m., Blaz took Matti and K.Y. to pick Jennifer up from work, after which the group drove to Walmart. On the way, Blaz mentioned to Jennifer that the neighbor boy might have dropped Matti. Jennifer said she would check Matti when they arrived at Walmart and, at that time, she observed Matti’s skin was ashen, her breathing was unusual, and she had bulging eyes. Acting urgently, Jennifer directed they take Matti to the hospital, where she died.
¶9 At trial, Blaz asserted Matti’s death was the result of being dropped by the neighbor boy. The State sought admission of evidence related to the July PFMA charge against Blaz pursuant to M. R. Evid. 404(b). The State argued the PFMA was relevant and rebutted Blaz’s defense because it demonstrated motive, opportunity, and the absence of accident or mistake. The District Court admitted the PFMA over Blaz’s objection. Blaz appeals.
STANDARD OF REVIEW
¶10 District courts have broad discretion to determine the admissibility of evidence. State v. Daffin, 2017 MT 76, ¶ 12, 387 Mont. 154, 392 P.3d 150 (citing State v. Madplume, 2017 MT 40, ¶ 19, 386 Mont. 368, 390 P.3d 142). We review evidentiary rulings for an abuse of discretion, which occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. Daffin, ¶ 12 (citing Madplume, ¶ 19). *109 To the extent an evidentiary ruling is based on a district court’s interpretation of the Montana Rules of Evidence, our review is de novo. Daffin, ¶ 12 (citing Madplume, ¶ 19).
DISCUSSION
¶11 1. Did the District Court abuse its discretion by admitting evidence about the prior PFMA conviction under M. R. Evid. 404(b)?
¶12 M. R. Evid. 404(b) provides that “[elvidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.” The Rule does not bar evidence, but rather prohibits a “theory of admissibility”—using evidence of other crimes or wrongs to prove the defendant’s subjective character “in order to show conduct in conformity with that character on a particular occasion.” State v. Dist. Court of the Eighteen Judicial Dist., 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 [hereinafter Salvagni]. Rule 404(b) prohibits admission of evidence to prove how a person is—fundamental character—for the purpose of implying conduct in accordance therewith, but does not necessarily prohibit admission of evidence to prove how a person acts—patterns of behavior—in circumstances related to the charged conduct. Rule 404(b) permits admission of prior “bad acts” evidence for “other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” This is a non-exclusive list[3] of permissible purposes that are not precise; rather, the categories are amorphous, overlapping, and dependent upon the underlying facts. As we have stated, “ jtlhe distinction between admissible and inadmissible Rule 404(b) evidence turns on the intended purpose of the evidence, not its substance.’ ” Daffin, ¶ 15 (quoting Madplume, ¶ 23). Rule 404(b) evidence “must be clearly justified and carefully limited.” State v. Aakre, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648. We turn to the application of the Rule in this case, and the purposes offered by the State for introduction of Blaz’s prior PFMA conviction.
M. R. Evid. 404(b)
A. Motive
¶13 Motive was extensively argued, both to the District Court and to this Court, as a basis for admitting the PFMA under Rule 404(b). The District Court stated that the “prior act [was] probative of Blaz’s *110 feelings toward Jennifer and toward Jennifer’s family and children living in the household,” and reasoned the PFMA was “reflective and probative of the alleged homicide” of Matti, and was therefore admissible. Blaz argues that the PFMA evidence “was not probative of a common motive [resulting] from Blaz’s common feelings,” nor was it admissible “to show a motive to hide evidence.” The State urges that the motive for both crimes was a “complete disregard” for Matti’s safety and wellbeing. Further, the State argues that
the evidence of Blaz’s prior PFMA provided the motive or explanation for why Blaz did not immediately bring Matti to the hospital for treatment of her injuries. As part of his PFMA suspended sentence, the city court ordered Blaz to have no contact with Jennifer. Blaz knew that taking Matti to the hospital would have revealed that he had been having contact with Jen[nifer] []... and it would have provided grounds to revoke his suspended sentence.
¶14 Motive can be abroad, nebulous concept. According to Black’s Law Dictionary, motive is “[sjomething... that leads one to act.” Black’s Law Dictionary 1172 (Bryan A. Garnered., 10 ed. 2014). But Black’s further notes that “ ]t,|he term “motive” is unfortunately ambiguous. That feeling which internally urges or pushes a person to do or refrain from doing an act is an emotion, and is of course evidential toward his doing or not doing the act.’ ” Black’s Law Dictionary, supra, at 1172 (quoting John H. Wigmore, A Students’ Textbook of the Law of Evidence 76 (1935)). We have stated that “[ejvidence is admissible to show motive when separate acts can be explained by the same motive,” Daffin, ¶ 19 (citing State v. Crider, 2014 MT 139, ¶ 25, 375 Mont. 187, 328 P.3d 612), and further explained that,
the motive is cause, and the charged and uncharged acts are effects', that is, both acts are explainable as a result of the same motive. The prosecutor uses the uncharged act to show the existence of the motive, and the motive in turn strengthens the inference of the defendant’s identity as the perpetrator of the charged act.
Salvagni, ¶ 59 (footnote omitted; emphasis added).
¶15 During oral argument, the State explained its motive theory was based upon Blaz’s “general hostility,” and that the PFMA tended to show Blaz’s generally hostile feelings toward Jennifer and Matti. However, to conclude that the acts at issue here “can be explained by the same motive,” Daffin, ¶ 19, or that both acts “are effects,” Salvagni, ¶ 59, of the “causes” of general hostility or complete disregard for *111 others, without more, would define motive very broadly and cast a wide net indeed for use of motive under Rule 404(b), potentially encroaching upon the impermissible use of motive as propensity evidence. We conclude that something further is necessary to demonstrate a cause and effect relationship. Such additional evidence was presented here.
B. Identity and Pattern
¶16 Under Rule 404(b), identity and pattern often overlap because unique behavior patterns can be used to establish identity. As we noted in Daffin, evidence of “distinctive or idiosyncratic methods” can illustrate “criminal signatures” and demonstrate a pattern, which can be used to identify a specific individual. Daffin, ¶¶ 17-18. In some instances, the evidence may be “offered to identify the defendant by showing that she committed the uncharged act with a modus operandi strikingly similar to that of the charged act.” Salvagni, ¶ 56. In this case, linking motive evidence with pattern and identity evidence creates a clear picture of Blaz’s “criminal signature.”
¶17 Facets of Blaz’s PFMA were similar to facets of the crime alleged here. First, Matti was a victim of the earlier domestic violence just as she was of the intentional acts that caused her death. Blaz’s earlier action illustrates a pattern of resolving family issues with violence and demonstrates his careless disregard for Matti’s safety and wellbeing. Second, and most importantly, is the similarity between the method of Blaz’s assault upon Jennifer during the PFMA, and the mechanics of the injuries sustained by Matti. Jennifer testified that, during the PFMA, Blaz grabbed her by her hair, threw her to the floor, and started banging her head against the floor. Dr. Kemp testified that Matti suffered craniocerebral and cervical trauma caused by “a very strong, forceful slam against some broad object.” These two injuries have similar mechanics, both involve a cranial assault inflicted by impact against a broad surface: Jennifer was grabbed by the head and slammed into the floor, while Matti sustained severe head trauma, including a skull fracture, and bruising on her neck. These were violent acts directed to the head and, in Matti’s case, caused death. Further, both the PFMA and the violence causing Matti’s death occurred in the privacy of the Blaz home, out of the sight and presence of others who could intervene. Jennifer and Matti were assaulted when the family returned home after a softball game. Additionally, Matti sustained injuries in the same home, while under Blaz’s care. Both victims were female family members. Taken as a whole, these facts suggested a pattern of Blaz (1) reacting to family problems, specifically with female family members, with violence; (2) attacking the heads of his victims; (3) striking his victims’ heads against a broad or flat surface; and (4) *112 attacking while in the privacy of the family home. These facts were evidence of a pattern of behavior, which is a permissible purpose and admissible under Rule 404(b).
C. Absence of Mistake or Accident
¶18 Blaz argues the PFMA was inadmissible to show an absence of mistake or accident because Blaz never said he had any part—accidental or otherwise—in causing Matti’s death. He argues, “[flundamental to the premise that other acts be admitted to show ‘absence of mistake or accident,’ is that the defendant claims he made a mistake.” (Emphasis in original.) The State argues evidence of the PFMA “strengthens the inference that [Blaz] killed Matti and rebuts his theory that [the neighbor boy] killed Matti by accidently dropping her on the living room floor.” As noted above, Blaz’s defense theory was that the neighbor boy dropped Matti, causing her death. The State sought to introduce evidence of the PFMA to rebut this defense theory.
¶19 In this case, much like in Salvagni, the purposes of pattern and identity are closely related to the absence of mistake or accident. As we have here explained, the PFMA and the violence toward Matti have similar elements which form a relevant pattern and serve to rebut Blaz’s defense that Matti was killed by the neighbor boy. The State’s case was largely circumstantial and relied heavily on the testimony of Dr. Kemp. However, the PFMA permissibly illustrated a pattern of conduct by Blaz linking his documented actions and the manner of Matti’s death. The District Court did not abuse its discretion in admitting the evidence.
M. R. Evid. 403
¶20 “All relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state.” M. R. Evid. 402. M. R. Evid. 403 allows relevant evidence to be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Probative evidence is usually prejudicial, but rises to the level of being unfairly prejudicial only “if it arouses the jury’s hostility or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues.” State v. Hicks, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149. “Even if evidence is potentially unfairly prejudicial, the Rule 403 balancing test favors admission—the risk of unfair prejudice must substantially outweigh the evidence’s probative value.” Madplume, ¶ 33. “A district *113 court may minimize unfair prejudice by admitting evidence for a particular purpose and limiting the uses to which the jury may put the evidence.” State v. Pulst, 2015 MT 184, ¶ 19, 379 Mont. 494, 351 P.3d 687 (citations omitted). Finally, “[a] limiting instruction generally cures any unfair prejudice.” State v. Hantz, 2013 MT 311, ¶ 44, 372 Mont. 281, 311 P.3d 800 (citing Salvagni, ¶ 49).
¶21 Before the District Court, Blaz’s Rule 403 argument was focused on the autopsy photographs. The District Court applied the Rule 403 balancing test and admitted the autopsy photographs. On appeal, Blaz focuses his current Rule 403 argument on the PFMA evidence, and asks that we conduct the Rule 403 balancing test de novo. However, the District Court implicitly completed Rule 403 balancing when it examined the PFMA evidence and issued a limiting instruction. As noted above, the Rule 403 balancing test favors admission and a limiting instruction to cure any unfair prejudice. Here, the District Court issued jury instruction number 11, which stated:
The State has offered evidence that the Defendant at another time engaged in other crimes, wrongs[,] or acts. That evidence was not admitted to prove the character of the Defendant or to show he acted in conformity therewith. The only purpose of admitting that evidence was to show proof of motive, opportunity, absence of mistake or accident. You may not use that evidence for any other purpose.
The Defendant is not being tried for that other crime, wrong[,] or act. He may not be convicted for any other offense than that charged in this case. For the jury to convict the Defendant of any other offense than that charged in this case may result in unjust double punishment of the defendant.
This instruction successfully cured any unfair prejudice that might have occurred when evidence of the PFMA was admitted, and the District Court did not abuse its discretion.
¶22 2. Did the District Court err by issuing a nonconforming written judgment that omitted credit for 318 days of time served?
¶23 The State concedes that Blaz is entitled to credit for 318 days, which he served pending trial. The credit was granted during the oral pronouncement of his sentence, but was not credited in the written judgment. We remand this matter to the District Court for entry of an amended judgment granting Blaz credit for 318 days of time served.
¶24 Affirmed in part, reversed in part, and remanded for entry of an amended judgment.
CHIEF JUSTICE McGRATH, JUSTICES WHEAT, BAKER and SHEA concur.

 Matti’s autopsy report stated:
The significant autopsy findings in this death are the subgaleal hemorrhage and underlying left parietal skull fracture (indicating an impact site), the bilateral thin subdural hemorrhage and bilateral subarachnoid hemorrhage, the left frontal lobe laceration (underlying the skull fracture ...), the bilateral diffuse and extensive retinal hemorrhages, involving multiple layers and with apparent retinoschisis, and the hemorrhages within the cervical dorsal root ganglia and adjacent nerves.

 K.Y. is Jennifer’s biological daughter and Blaz’s stepdaughter.

 “Other-acts evidence ‘may be admissible for many other purposes, including those specifically listed in Rule 404(b).’ ” State v. Stout, 2010 MT 137, ¶ 97, 356 Mont. 468, 237 P.3d 37 (Nelson, J., dissenting) (citation omitted; emphasis added).