FILED

01/16/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0646

DA 21-0646

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 5

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

NELS JERRY PETERSON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC 19-135
Honorable Howard F. Recht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Michael Marchesini, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

          William E. Fulbright, Ravalli County Attorney, Angela Wetzsteon, Deputy
County Attorney, Hamilton, Montana

Submitted on Briefs: November 8, 2023

Decided: January 16, 2024

Filed:

                               _____
                                        Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Nels Jerry Peterson appeals his November 2021 judgment of conviction in the Montana Twenty-First Judicial District Court, Ravalli County, on the offense of sexual assault. We address the following restated issue:

> *Did the District Court abuse its discretion by permitting evidence of Peterson's prior sexual conduct with other young girls under M. R. Evid. 404(b) and 403?*

We conclude that, although some of the evidence may have been admissible for a permissible purpose under Rule 404(b), the potential for unfair prejudice substantially outweighed its probative value as presented. We therefore reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Peterson was charged with felony sexual assault of his eleven-year-old step-granddaughter (Q.H.) for allegedly putting his hand between her legs and moving his fingers one night when they were watching television together in Q.H.'s home in the summer of 2018. Q.H. told her mother about the incident in February 2019, and her mother reported it to law enforcement. In a forensic interview conducted at Emma's House, a local children's advocacy center, Q.H. disclosed that she sat on Peterson's lap while they were watching TV together and the touching occurred when her grandmother left the room to use the restroom. Q.H. said that she slapped Peterson's hand away and moved to the other end of the couch. Q.H. said that the only other time Peterson made her feel uncomfortable was one previous occasion when she was at his home and he had on only his underwear.

2

¶3 Detective Auch interviewed Peterson, who initially denied committing any such act, saying, "I swear I didn't…I know better so I don't do somethin' like that." Detective Auch accused Peterson of lying. Peterson then proceeded to equivocate during the interview, first saying he did not remember and repeating that it is not right to do that to little girls. Later, Peterson said he did not know if he did it or not, followed by, "I probably did it." When Detective Auch asked Peterson if he'd "done something like that before," Peterson responded, "no."

¶4 Before trial, Peterson moved to exclude evidence of prior acts, crimes, or wrongs under M. R. Evid. 404(b), specifically regarding the allegations of other sexual assault victims referenced by the State in its charging documents. The State's affidavit represented that Peterson's criminal history included allegations of four prior instances of similar behavior concerning different girls between the ages of eight and seventeen years old. One incident led to a charge against Peterson of "Child Molestation—3rd degree (felony)" that resulted in his conviction of Communication with a Minor (Family Member) for Immoral Purposes in Kitsap County, Washington. He served forty-five days in jail for that offense and was required to register as a sexual offender. The State proposed to offer evidence at trial, uncovered during its investigation, that three other women (A.H., A.D., and C.S.)— two of them Peterson's nieces and the third the daughter of his intimate partner—had accused him of committing sexual offenses against them when they were around the same age as Q.H. was.

¶5    The District Court denied Peterson's motion in limine, finding the evidence admissible for the purposes of Peterson's knowledge of his conduct, intent, and absence of mistake; what motivated Peterson to commit the offense; and Peterson's preparation or plan. The court explained that based on Peterson's statements to Detective Auch and his "general defense theory," the State anticipated Peterson would argue that his conduct toward Q.H. was "innocent, innocuous, or accidental." The court agreed with the State that the other acts evidence demonstrated that Peterson "had a specific internal motivation—a sexual attraction to young girls—that caused him to commit a similar act on prior occasions and that the same internal motivation led to the charged act." Considering "the State's uncontroverted representation that Defendant's victim in this case reported that Defendant also exposed himself to her in the same manner in his apartment," the court found that the other acts evidence serves as proof of Peterson's "preparation and plan of grooming and abusing girls." Balancing the probative value against prejudicial effect, the court recognized that the other acts evidence "is particularly prejudicial due to its highly inflammatory nature." However, it also found that it is "highly probative of Defendant's knowledge and intent and will serve to discredit any defense that Defendant engaged in the charged conduct by accident or mistake."

¶6    At trial, the prosecutor's opening statement began:

> I expect that the evidence in this case will show you that this is about the Defendant preying on a little girl named [Q.H.] as a trusted member of [Q.H.'s] family. I also expect you will hear evidence that the Defendant has similarly preyed on other young girls in his family.

4

The State gave an overview of the testimony the jury would hear, including the testimony from A.H., A.D., and C.S. The State said A.H. would testify that on one occasion when A.H. was sixteen years old and her mother was dating Peterson, Peterson "was walking around his home naked from the waist down, touching himself, in front of [A.H]." It said that A.D. would testify that when she was around eleven years old, Peterson "began a sexual relationship with her, of all types, that lasted for about a year or two." Finally, the State said that another niece, C.S., would testify that Peterson "engaged in sexual conduct with her" from "when she was very young" to "when she was 14" and that Detective Auch would confirm that Peterson was eventually convicted in the State of Washington for his conduct with C.S.

¶7 The State's first witness was Detective Auch, who testified to his investigation of the case. Detective Auch noted that as part of his investigation, he looked into Peterson's criminal history and that the jury would hear from A.H., A.D., and C.S. The State next called A.H., who testified that Peterson exposed himself when she went to his home to retrieve her mother's belongings in 2001. A.H. said that she had reported the incident to the police, but they told her it was a "he-said, she-said" case and they could not do anything about it. After A.H., the State called Q.H. She testified of the incident where Peterson allegedly touched her vagina while she was sitting on his lap and the previous time when she was at Peterson's home and Peterson had on only his underwear. Q.H.'s mother, father, and grandmother then testified. The next day, the jury heard testimony from the executive director and a registered nurse from Emma's House.

5

¶8 Next, one of Peterson's nieces, A.D., testified that she and Peterson had sexual intercourse three times a week or more during a year that she lived with him after running away from home at age twelve. A.D. testified that she eventually reported Peterson's conduct but stopped cooperating in the investigation after suspecting that her mother tipped Peterson off that she would be wearing a body wire and felt betrayed by her family. The second niece, C.S., testified that Peterson began sexually assaulting her from when she was five years old until she was around fourteen. C.S. said that she did not remember what happened after she reported it to law enforcement.

¶9 The State again called Detective Auch to testify to his investigation regarding A.H., A.D., and C.S. Detective Auch testified that of the three incidents, only the incident involving C.S. led to criminal charges for which Peterson was convicted of Communication with a Minor for Immoral Purposes in the state of Washington. The court admitted into evidence Peterson's prior judgment of conviction, of which the jurors had a copy for deliberations. Detective Auch then testified to his interview with Peterson. Finally, the State played the video of Detective Auch's interview with Peterson.

¶10 In the first few sentences of its closing argument, the State offered, "there's one thing that all of the women and the young girl who testified here have in common, and that is the Defendant." It discussed the trial evidence, including Q.H.'s testimony and forensic interview and Peterson's interview acknowledging that he "probably did it." The prosecutor asserted that Peterson acted "knowingly" and that his actions were not

6

accidental or inadvertent touching based on Q.H.'s description of the assault and because Peterson "has done it before." The prosecutor then said:

> One of the questions you are probably grappling with at this stage is, where do those other three women fit in in this situation? How do we consider that in our deliberations? Where those fit is it shows you what motivates the Defendant. It shows you what his motive is to sexually assault [Q.H.]. And it also shows you that it's not a mistake. It's not inadvertent.

¶11 Peterson's closing argument challenged the veracity of the first niece's account of events and asserted that Peterson took accountability when he pled guilty on the second niece's allegations. In rebuttal, the prosecutor responded to the veracity dispute and then stated:

> To the extent that [defense counsel] or [Peterson] is trying to discredit those claims, I just want to remind you again, it's not about what he did to those ladies. It's just not. But what it does show us, again, is what motivates this Defendant, why he would even have the motivation to touch [Q.H's] vagina and move his fingers around while she's sitting on his lap.

¶12 The court gave a Rule 404(b) limiting instruction, among its other instructions. The jury found Peterson guilty, and he appeals.

## STANDARD OF REVIEW

¶13 We review evidentiary rulings for an abuse of discretion. *State v. Fleming*, 2019 MT 237, ¶ 9, 397 Mont. 345, 449 P.3d 1234. A trial court abuses its discretion if it acts arbitrarily without the employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *Fleming*, ¶ 9 (citation omitted).

7

**DISCUSSION**

*Rule 404(b)*

¶14 "As a general rule, character evidence is not admissible to prove conduct." *State v. Franks*, 2014 MT 273, ¶ 14, 376 Mont. 431, 335 P.3d 725 (citing M. R. Evid. 404). "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." M. R. Evid. 404(b). The danger in admitting evidence of prior bad acts is that the jury will "prejudge" the accused and "deny him a fair opportunity to defend against a particular charge." *State v. Gowan*, 2000 MT 277, ¶ 19, 302 Mont. 127, 13 P.3d 376 (quoting *Michelson v. United States*, 335 U.S. 469, 476, 69 S. Ct. 213, 218 (1948)).

¶15 Prior bad acts may, however, be admissible for other non-propensity purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. M. R. Evid. 404(b). Rather than prohibiting the admission of evidence, Rule 404(b) prohibits a theory of admissibility. *Franks*, ¶ 14 (citing *State v. Dist. Ct. of the Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 47, 358 Mont. 325, 246 P.3d 415 [hereinafter *Salvagni*]). Evidence of prior bad acts is not admissible if it is offered for a purpose that requires the inference from bad act to bad person to guilty person, but may be admissible if it proves a material issue without requiring any inference to the defendant's criminal disposition. *Franks*, ¶ 14 (internal quotations and citations omitted). The distinction between admissible and inadmissible Rule 404(b) evidence thus turns on the

8

intended purpose of the evidence, not its substance. *State v. Madplume*, 2017 MT 40, ¶ 23, 386 Mont. 368, 390 P.3d 142 (citing *Salvagni*, ¶¶ 47, 62-63).

¶16 To prevent the permissible uses of Rule 404(b) from overpowering the general rule barring propensity evidence, the trial court must ensure that the use of prior bad acts evidence is "clearly justified and carefully limited." *Madplume*, ¶ 23 (quoting *State v. Aakre*, 2002 MT 101, ¶ 12, 309 Mont. 403, 46 P.3d 648). "Mere reference to a permissible purpose is insufficient for admission of other acts evidence under Rule 404(b)." *Madplume*, ¶ 23. "Other acts evidence is admissible for a permissible Rule 404(b) purpose only if the proponent can clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *Madplume*, ¶ 23 (internal quotations and citation omitted). Although the District Court admitted Peterson's prior bad acts under several theories of admissibility, we limit our consideration to the theories of motive and intent.

¶17 "Evidence is admissible to show motive when separate acts can be explained by the same motive." *State v. Daffin*, 2017 MT 76, ¶ 19, 387 Mont. 154, 392 P.3d 150 (citing *Salvagni*, ¶ 59; *State v. Crider*, 2014 MT 139, ¶ 25, 375 Mont. 187, 328 P.3d 612). Peterson compares his case to *State v. Blaz*, where we rejected motive as a theory of admissibility, explaining that the defendant's "general hostility" and "complete disregard" for his daughter's safety was not a sufficiently specific motive that would explain both his prior assault of his partner and subsequent murder of his daughter. 2017 MT 164, ¶¶ 13, 15, 388 Mont. 105, 398 P.3d 247. By contrast, in *Daffin*, we affirmed under Rule 404(b) the

9

admission of prior uncharged sexual abuse of multiple victims as relevant to the charged offense of sexual intercourse without consent because it was explainable by a common motive—the accused's ongoing "longstanding sexual fixation with underage teen girls, particularly living in vulnerable family situations," and resulting desire to "pursue[]" and "sexually assault" them. *Daffin*, ¶¶ 19-21. The State similarly articulated in its response to Peterson's 404(b) motion in limine that "the evidence of [Peterson's] sexual conduct with young girls demonstrates a longstanding sexual fixation with underage girls and serves to prove what would motivate [Peterson] to commit the crime charged in this case." The State's reason for admitting the prior bad acts under motive was sufficiently specific; each of Peterson's instances of conduct, including the one with which he stood charged here, involved girls under the age of sixteen who were—either by blood or relationship—within his family circle. And in each he allegedly took advantage of his close relationship and their vulnerability to engage in inappropriate sexual behavior. The District Court did not abuse its discretion when it found Peterson's prior bad acts admissible for the purpose of motive.

¶18    Further, the existence or non-existence of a motive to commit the charged offense is generally a relevant consideration in the assessment of whether an accused had the requisite criminal mental state. *State v. Lake*, 2022 MT 28, ¶ 28, 407 Mont. 350, 503 P.3d 274 (citations omitted). Peterson argues on appeal that his prior acts were not admissible to prove his intent because it was not at issue in this case. Rather, Peterson asserts that his defense "from the start was one of general denial," as evidenced by his statements to

Detective Auch and his omnibus filing noting that Peterson intended only to assert the defense of "general denial."

¶19    In *State v. Stewart*, we stated that a typical prosecution is reducible to three components: "(1) someone committed the *actus reus* (i.e., forbidden act) alleged in the indictment or information; (2) that person possessed the requisite *mens rea* (i.e., criminal intent or state of mind); and (3) that person was the defendant." 2012 MT 317, ¶ 64, 367 Mont. 503, 291 P.3d 1187. Peterson's "general denial" put the elements of the offense at issue. The prosecution was required to prove here that Peterson knowingly subjected Q.H. to any sexual contact without consent. Section 45-5-502(1), MCA. In *Daffin*, we upheld the use of prior bad acts evidence for the purpose of mental state where the defendant challenged the first and second components of prosecution by claiming that he did not abuse or sexually assault any of the victims of the crimes for which he was charged. *Daffin*, ¶¶ 21-22. Similarly here, Peterson's general denial required the State to prove Peterson's intent.

¶20    Therefore, we hold that the District Court did not abuse its discretion in determining that Peterson's prior acts were admissible to show motive and intent. "However, the relative probative value of the specific manner and frequency in which the State referenced and elicited witness references to them at trial is another matter under M. R. Evid. 403." *Lake*, ¶ 31.

***Rule 403***

¶21    Evidence that is offered for a valid purpose under Rule 404(b) remains subject to the balancing test prescribed by Rule 403. *Franks*, ¶ 15 (citing *Stewart*, ¶ 67). Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Because relevant evidence is inherently prejudicial to the opposing party, the Rule expressly applies only to evidence that poses a "danger of *unfair* prejudice." *Lake*, ¶ 32. Additionally, the Rule 403 balancing test favors admission because the risk of unfair prejudice must *substantially outweigh* the evidence's probative value. *Madplume*, ¶ 33. "We readily acknowledge that a trial judge is in the best position to evaluate the evidence's potentially prejudicial effect and has broad discretion in ruling on the admission of prejudicial evidence." *Fleming*, ¶ 32 (citation omitted).

¶22    We have, however, repeatedly warned district courts and the State to exercise great caution in the use of prior acts evidence regarding child sexual abuse. *Lake*, ¶ 32 (citing *State v. Pulst*, 2015 MT 184, ¶ 19, 379 Mont. 494, 351 P.3d 687; *Franks*, ¶ 17; *State v. Sage*, 2010 MT 156, ¶¶ 36-37, 357 Mont. 99, 235 P.3d 1284). This caution arises from the highly inflammatory nature of child sexual abuse evidence. *Lake*, ¶ 32 (citing *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993) ("no evidence could be more inflammatory or more prejudicial than allegations of child molestation")).

¶23    In *State v. Murphy*, we concluded that the court's admission of the defendant's prior bad acts involving the same victim did not violate Rule 403 because "the other acts were not more abhorrent than the current charge[.]" 2021 MT 268, ¶ 16, 406 Mont. 42, 497 P.3d 263. The same cannot be said here. Peterson stood trial for touching Q.H.'s vagina on one occasion over her pants. One niece, A.D, testified that after she ran away from home to live with Peterson when she was around twelve years old, he forced her to have sexual intercourse at least three times a week for a year. Another niece, C.S., testified that Peterson repeatedly digitally penetrated her for nine years beginning when she was five years old.

¶24    Evidence of a defendant's prior bad conduct may amplify its inherently prejudicial nature by virtue of the manner in which it is presented and used. In *Fleming*, we reversed a defendant's conviction for criminal endangerment where the District Court read an instruction to the jury panel prior to *voir dire* describing the defendant's fourteen-year-old conviction for criminal endangerment that resulted in the death of one teenage girl and the injury of another. *Fleming*, ¶¶ 6, 41. We concluded that presenting the jury at the beginning of trial with the tragic details of Fleming's prior conduct of supplying alcohol to a minor and the purpose for which the evidence was used at trial "brought significant risk that the jury would convict Fleming based on his prior conduct" and was too prejudicial to be overcome by a cautionary instruction. *Fleming*, ¶¶ 31, 35.

¶25    Similarly here, the State began its opening statement commenting that the jury would "hear evidence that the Defendant has similarly preyed on other young girls in his

13

family." The State then provided detailed descriptions of the expected testimonies of A.H., Q.H., A.D., and C.S. Before Q.H. testified, the State asked A.H. to testify what happened to the report she made to the police, which A.H. responded was filed but was a "he-said, she-said" situation in which Peterson was never convicted. It likewise asked A.D. if her case was "prosecuted until [Peterson] was convicted"—she replied no. After C.S. testified that she did not remember what happened after she reported the incident to law enforcement, the State asked Detective Auch to explain Peterson's Washington state conviction of Communication with a Minor for Immoral Purposes for which he was convicted for his conduct with C.S. The State put Peterson's judgment into evidence, and the court allowed the exhibit—showing the 45-day jail sentence—into the jury room for the jury to review during deliberations. Detective Auch reiterated that Peterson was not convicted for his conduct regarding A.H. and A.D. Finally, in its closing argument, the State linked the prior acts to the crime which Peterson was charged in saying, "there's one thing that all of the women and the young girl who testified here have in common, and that is the Defendant." The State summarized the testimony of A.H., A.D., and C.S, and offered that A.D.'s police report was unable to produce a conviction because she lacked the support that Q.H. had from her parents. The State contrasted A.D.'s case with that of C.S., who had supportive parents and whose allegations thus culminated in a conviction against Peterson. It reminded the jury of Peterson's conviction in C.S.'s case, saying, "[a]nd you have that conviction information as Exhibit 9. Take a look at that. Defendant served 45 days for that crime. It's on that exhibit." The State's use of the prior bad acts throughout

14

its opening statement, Detective Auch's testimony, the testimony of A.H., A.D., and C.S., and closing statement reminded the jury numerous times of Peterson's prior bad acts and made clear to the jury that Peterson was never brought to justice for the vast majority of his conduct.

¶26  Although the State told the jurors in closing that Peterson's past alleged crimes show his motive and "it's not about what he did to [A.H., A.D., and C.S.]," the State's use of the testimony from three women who accused Peterson of sexually abusing them when they were children carried significant danger that the jury would find Peterson guilty because he had committed similar offenses before and had not been adequately punished. The State's use of the evidence had a natural tendency to induce the jury's hostility toward Peterson, resulting in unfair prejudice. The District Court's limiting instruction was not sufficient to protect the defendant from undue prejudice in the face of the State's repeated reminder that the defendant committed sex crimes involving multiple other family members for which he served a combined total jail term of forty-five days. The trial court could have put limits on the State's use of the prior bad acts evidence to guard against such prejudice. *See, e.g., Pulst*, ¶ 20 (prior acts evidence affirmed under Rule 403 because the trial court limited discussion of defendant's prior sexual assault to the "bare facts of its occurrence and the surrounding circumstances[;]" "was vigilant in enforcing this ruling" during trial; and "gave instructions to the jury on at least three separate occasions reminding it of the limited use to which the evidence could be put.") But the extent of the other acts evidence here overwhelmed the singular incident with which Peterson stood

15

charged. "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Fleming*, ¶ 33 (citations omitted). Repeated reference to the details of Peterson's longstanding unpunished sexual abuse of his nieces made it "more likely the jury would convict because he had done this before and had not learned his lesson," *Fleming*, ¶ 35, or "had simply gotten away with it," *Franks*, ¶ 19.

¶27 The State contends that even if the District Court erred in admitting the 404(b) evidence, the error was harmless. We have adopted a two-step analysis to determine whether an error "prejudiced the criminal defendant's right to a fair trial and is therefore reversible." *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735. The first step in conducting harmless error analysis is to determine whether the error is structural error or trial error. *Van Kirk*, ¶ 37. A structural error affects the framework within which the trial proceeds, while trial error typically occurs during the presentation of a case to the jury. *Van Kirk*, ¶¶ 38, 40. Trial error is reviewed qualitatively for prejudice relative to other evidence introduced at trial. *Van Kirk*, ¶ 40. Here, the State's use of 404(b) evidence was a trial error as it occurred during the presentation of evidence.

¶28 The second step in the analysis is to determine under the "cumulative evidence" test whether the trial error was harmless. *Van Kirk*, ¶¶ 43-44. If the tainted evidence was admitted to prove an element of the offense, then the State must direct us to admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have

16

contributed to the conviction. *State v. Derbyshire*, 2009 MT 27, ¶ 47, 349 Mont. 114, 201 P.3d 811 (citing *Van Kirk*, ¶¶ 44-45). Here, the evidence was admitted to prove that Peterson knowingly subjected Q.H. to sexual contact without her consent. *See* § 45-5-502(1), MCA. The State argues that there is no reasonable possibility the prior acts evidence contributed to Peterson's conviction. It points to Q.H.'s testimony regarding the charged offense and the previous time when Peterson had on only his underwear; the State's expert witness from Emma's House, who explained how perpetrators will present themselves to possible victims with little or no clothing to desensitize them; Q.H.'s parents' observations about Q.H.'s changed behaviors and attitude towards Peterson after the alleged assault; and Peterson's interview with Detective Auch acknowledging that he "probably" did what Q.H. accused him of doing. As there was cumulative evidence proving the elements of the offense, the State contends, any admission of tainted evidence concerning those elements was not reversible error. Peterson responds that Q.H.'s testimony was inconsistent and that, in the context of Detective Auch accusing Peterson of lying multiple times during his interview, a juror reasonably could interpret Peterson's statements as a capitulation to Detective Auch's aggressive questioning and not an admission of guilt.

¶29 The *Van Kirk* test is about the *qualitative* aspect of the tainted evidence, not the quantitative. *Van Kirk*, ¶¶ 43-44. The State's use of the evidence of three separate incidences of heinous sexual abuse bolstered Q.H.'s testimony to the jury. The State used the prior acts evidence to remind the jury that Peterson "has done it before," bordering on

a propensity argument. As explained above, the volume and detail of the other acts evidence, combined with the jury's knowledge that Peterson had faced few, if any, consequences for his acts, tipped the balance of prejudice when weighed against its probative value. The State has not met its burden to show no reasonable possibility that its use of the tainted evidence might have contributed to Peterson's conviction. We therefore hold that the error was not harmless.

## CONCLUSION

¶30 Peterson's prior sexual conduct was admissible to show motive and intent, but the State's use of the evidence risked unfair prejudice that substantially outweighed its probative value. The State has not met its burden to demonstrate that the evidentiary error was harmless. We reverse and remand for a new trial.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE